IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

ALEXANDER D. NITECKI,

                       Plaintiff,                    Case No. 3:13 CV 1859

      -vs-

                                            <u>MEMORANDUM  OPINION</u>

COMMISSIONER OF SOCIAL SECURITY,

                       Defendant.

KATZ, J.

Alexander Daniel Nitecki applied for supplemental security income benefits and for child's insurance benefits with the Social Security Administration.  After exhausting his available administrative remedies, the Commissioner of Social Security subsequently denied Mr. Nitecki's applications for benefits.

Mr. Nitecki then sought judicial review of the Commissioner's decision.  The case was referred to Magistrate Judge James R. Knepp II for findings of facts, conclusions of law, and recommendations.  The Magistrate Judge issued a report recommending that the Court affirm the Commissioner's decision denying Mr. Nitecki's applications for benefits.  This matter is before the Court pursuant to Mr. Nitecki's timely objections to the Magistrate Judge's report.

The Court has jurisdiction over the Commissioner's final decision denying Mr. Nitecki's request for benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832 (6th Cir. 2006).  In accordance with *United States v. Curtis*, 237 F.3d 598, 602–03 (6th Cir. 2001), this Court has made a de novo determination of the Magistrate Judge's report.  For the reasons stated below, the Court adopts the report and affirms the Commissioner's denial of benefits.

**I.  Standard of Review**

This Court conducts a de novo review of those portions of the Magistrate Judge's report to which Mr. Nitecki objects. 28 U.S.C. § 636(b)(1). In so doing, this Court reviews the Commissioner's decision to determine whether it is supported by substantial evidence. 42 U.S.C. § 405(g). This Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 528 (6th Cir. 1997). The Court does not re-weigh the evidence, but must affirm the Commissioner's findings as long as there is substantial evidence to support those findings, even if this Court would have decided the matter differently, and even if there is substantial evidence supporting the claimant's position. *See Brainard v. Sec'y of Health & Human Servs*., 889 F.2d 679, 681 (6th Cir. 1989). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kyle v. Comm'r of Soc. Sec*., 609 F.3d 847, 854 (6th Cir. 2010) (citations and internal quotation marks omitted). The Commissioner's decision is not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Id*. at 854–55.

## II. Discussion

Mr. Nitecki has not objected to the Magistrate Judge's factual summary of the case as set forth on pages one through thirteen of the report. Therefore, the Court adopts the Magistrate Judge's summary of the facts. The Magistrate Judge's summary of the case is as follows:

## PROCEDURAL BACKGROUND

On May 26, 2010, Plaintiff filed applications for SSI and CIB, claiming he was disabled due to depression, anxiety, attention deficit hyperactivity disorder (ADHD), and panic disorder. (Tr. 187-92, 211). He alleged a disability onset date beginning March 15, 2002. (Tr. 187). His claims were denied initially and on reconsideration (Tr. 83-98). Plaintiff then requested a hearing before an administrative law judge (ALJ). (Tr. 99). Plaintiff (represented by counsel) and a vocational expert (VE) testified at the hearing, after which the ALJ concluded Plaintiff could perform unskilled work and thus, was not disabled within the meaning of the Act. (*See* Tr. 13-31). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 416.1481. On August 23, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### Personal Background, Vocational History, Medical Evidence

Plaintiff was twelve years old on his alleged onset date and 22 years old at the time of the ALJ hearing. (Tr. 187). He lived in a house with his mother and two siblings; his father also lived there until he passed away in 2008. (Tr. 47). In disability reports, Plaintiff reported his daily activities included watching television, "browsing" the internet, preparing meals, taking walks, and caring for several cats. (Tr. 218-19). Plaintiff had a driver's license, went out three-to-five times per week, and shopped in stores several times per week. (Tr. 220). He could care for himself but was forgetful about grooming. (Tr. 219). He cleaned, washed dishes, and vacuumed, although he performed these chores only once a week. (Tr. 220).

Plaintiff said his interests included reading, writing, playing instruments and video games, and target shooting. (Tr. 221). However, he said he performed these activities rarely due to a decline in energy. (Tr. 221). He was able to walk six miles, despite later testifying he could only walk for fifteen minutes, and said he was able to follow written and spoken instructions well and got along with authority figures "very well." (Tr. 53, 222).

Plaintiff also reported he worked as a telemarketer for a short period in 2007. (Tr. 55). In disability reports, Plaintiff said he stopped working because of his conditions. (Tr. 211). However, he told a consultive examiner he left because he found the work "extremely monotonous" (Tr. 279); and at the hearing, he testified he had received a warning about his absenteeism and quit because he was overwhelmed by his anxiety. (Tr. 55).

Plaintiff's testimony and medical treatment records were carefully, accurately, and thoroughly summarized by the ALJ in this case. (Tr. 13-31). Accordingly, the undersigned incorporates these portions of the ALJ's decision herein but will subsequently summarize the opinion evidence.

The claimant testified that he was unable to work because he felt as if he had mono, the flu or the norovirus.  He said that everything was difficult to do, that he was easily stressed and that he experienced panic attacks.  Although he admitted his panic attacks were better controlled with medication, he said he still experienced symptoms of free-floating anxiety.  The claimant also indicated that due to ADHD, combined type, he had limited concentration, and the medications did not completely restore him to what he would consider optimal conditions.  The claimant described his typical day as consisting of browsing the internet, watching television with the sound muted, or sitting on his bed.  He said that he did not care for his personal needs because he saw no point in grooming and personal hygiene.  He also denied performing any household chores, such as cleaning, dishwashing, cooking or laundry.  He did admit to going to the grocery store for ten minutes at a time, once a month, to going out to eat with his family several times per month, and to mowing the lawn several times during the summer.

Regarding his sleep habits, the claimant said that he had no set sleep schedule, instead going to bed at different times every day due to his severe sleep problems, and without medication, it took hours for him to fall asleep.  He indicated that he had a three-day sleep study that revealed no sleep disorder, and the doctor who conducted the study suggested that depression was the cause of the sleep problems.  The claimant did admit that he had been informed of the benefit of going to bed at the same time every day, but claimed that it was not possible with his schedule, which routinely shifted forward three hours every day.  He explained that it would take him three hours to get to sleep, and he would wake up three hours later than usual, no matter when he went to sleep.  The claimant testified that even with different medications for sleep aid, it still took an hour to fall asleep, and without medications, it took three to four hours to fall asleep.  Once asleep, he said that he typically slept for 12 to 14 hours over the last ten years.

The claimant also testified that he had been diagnosed with conversion disorder after undergoing bullying in elementary school for two years.  He said that he reported the situation to school officials, but they failed to address the situation, and he developed a fear of going school affecting his grades.  After developing pseudoseizures related to a diagnosis of conversion disorder in the spring of 2002, the claimant said that he withdrew from school, and was enrolled in an online course of study.  The claimant also described the circumstances that led to his recent hospitalization for

4

suicidal thoughts.  He said that a comment by his therapist about his increased stress levels triggered the realization of what was going on with him, and he responded by going on a drinking binge and increased his cigarette use.  One morning, he said that he was having "disturbing and intrusive thoughts" about throwing himself off a bridge, and after experiencing these thoughts for a day and a half, he contacted his therapist, and she arranged for the inpatient hospitalization.  He also described three past instances, including the last one, of suicidal ideations, and claimed two occasions on which he self-harmed himself with a box cutter.

The claimant acknowledged that his medications had been changed many times, and he said that he had already tried every "SSRI and ADHD drug that are on the market in the United States." The claimant described side effects to several of his medications, including Abilify, which caused uncontrollable facial twitching and shivers.  The only side effects to currently prescribed medication he listed were hunger from the Remeron and Doxepin, dry mouth from the Remeron, and memory problems and slower word processing from the Klonopin.  As an example of memory loss, the claimant described forgetting the names of movies or movie actors.  The claimant indicated that when he was left alone for a few minutes, he began to feel depressed and to have very negative thoughts about himself, but when he was in a group with people he trusted and knew well, he felt better, and the negative thoughts did not intrude. He did state that in groups of strangers, he felt extremely awkward and isolated.  Regarding the panic attacks, the claimant denied that there was any particular trigger for them, and said that he had experienced them driving, at home, at stores, and at various times of the day.  He denied having any friends that he socialized with, but did indicate that recently he had become acquainted with his neighbors.  Panic attacks occurred weekly on the Remeron, daily prior to Remeron, and he had to take Xanax to abort them. Currently he said they occurred once a month with the Doxepin, and lasted from five minutes to 30 minutes, with symptoms of an intense sense of dread and doom, chest pains, shortness of breath, uncontrollable swearing, pacing, or stillness.

The claimant denied that even with medication, he could focus on something for two hours at a time, and even when performing simple tasks he would lose track of what he was doing, and become exhausted physically and mentally.  On the internet, he said he usually skimmed articles, but occasionally read an entire article, with fairly good retention and he would be able to relate to

5

someone the next day what he read.  However, he reported he had not been able to complete his GED, but recently reengaged with BVR to obtain financing for a class at a local vocational school that his therapist had recommended to help him get accustomed to dealing with other people in a social setting.  Unfortunately, he said that BVR did not have available funds at such short notice, and he was unable to enroll in the class.  After getting out of the hospital, the claimant said he felt that he had developed better coping skills and was better able to handle his anxiety and depression, but still believed that he was still unable to work in his current state.

The record reveals that the claimant was enrolled in Mohawk Local schools from 1995 to 1996, where he had an Individual Education Plans (IEP) from November 1995 to May 1997, which included speech therapy, and September 2002 to December 2006 with extra tutoring and monitoring due to an emotional disturbance, which was manifested by severe anxiety and panic attacks in response to school settings.  In approximately 2002, after completing the sixth grade, the claimant became unable to attend classes in an educational setting due to a condition diagnosed as conversion disorder by Kenneth Davis, Ph.D., which manifested in physical symptoms such as fainting episodes and headaches, and was intensified by stress.  The claimant earned high school credits under an online home instruction program.  However, by April 2006, Dr. Davis noted that no current instances of conversion disorder symptoms were reported by the claimant or his parents, and the psychologist recommended that he start tutoring at the Center for Exceptional Children.  The claimant was enrolled in Bridges Community Academy in August 2006, where he received IEP accommodations in reading, writing, math, science, and citizenship classes.  However, in January 2007, Dr. Davis noted an increase in symptoms of anxiety and inability to concentrate while performing schoolwork in any form, including computer work, and the claimant reported that he only attended classes in a school setting for two to three months.  His grade record from the final school term in June 2007 reflects failing or incomplete grades in all subjects (Exs. l lF, 12F).

The results of several intelligence tests in the record indicate that the claimant is of average to above average in cognitive functioning.  On the Wechsler Intelligence Scale for Children-Fourth Edition (WISC-IV) administered in November 2004, the claimant achieved a Verbal Comprehension (VCI) score of 134, a Perceptual Reasoning (PRI) score of 88, a Working Memory

(WMI) score of 94, a Processing Speed Index (PSI) score of 83, and a Full Scale IQ (FSIQ) score of 102 (Ex. 11F).  The evaluator, Kimberly Pachis, School Psychologist, noted that these scores demonstrated that the claimant had a superior knowledge of vocabulary and this area was more developed than remaining areas, and she felt that he would perform better on tasks requiring verbal understanding and explanations and have more difficulty on tasks requiring visual or spatial reasoning.  Dr. Pachis also remarked that the claimant's history showed that he had demonstrated significant emotional symptoms that impeded his ability to learn and function in a school setting, and his fear was so great he had been prevented from even attending school.  She recommended that he participate in some form of instruction and curriculum in a school setting to improve his social skills and develop his ability to deal with people in every day settings in order to prepare for the future.  She also commented that he would need to stay motivated to complete work and tasks (Ex. 11F).

In April 2010, as part of testing to qualify for services through the Bureau of Vocational Rehabilitation, the claimant took the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III), and obtained the following scores:  Verbal IQ:  132, Performance IQ:  100, and Full Scale IQ:  117 (Ex. 1F).  On the Brown Form test, the claimant's raw score of 85 fell well above the cutoff score of 55 for probable ADHD, and on the Personality Assessment Inventory, his clinical profile revealed a severely depressed, discouraged and withdrawn individual.  The evaluator, Richard Litwin, Ph.D., diagnosed the claimant with ADHD, inattentive type, and major depressive disorder, recurrent, severe.  He recommended that instead of vocational placement, the claimant concentrate on completing his GED, explore opportunities to volunteer in the community and participate in social/recreational activities to reduce isolation.  He also strongly encouraged the claimant to engage in exercise, regular sleep, and proper diet to address his depressed state (Ex. 1F).

Jatinder Rana, M.D., has provided psychiatric treatment and medication management to the claimant since April 2008. When he first assessed the claimant, Dr. Rana diagnosed depressive disorder, not otherwise specified, rule out attention deficit hyperactivity disorder, and prescribed Zoloft 50 mg. and Ambien for sleep problems.  After a month, the claimant reported his sleep was improving and his mood was better, but he expressed anxiety related to school and test issues, and Dr. Rana replaced the Zoloft with

Lexapro 10 mg. daily, and the following month added Adderall 15 mg. increasing to 30 mg. for hyperactivity.  Treatment notes describe an ongoing attempt by Dr. Rana to address various side effects of which the claimant complained by adjusting and substituting various medications, including Vyvause, Daytrana, Ativan, Xanax, Celexa, Dexedrine, Prozac, and Ritalin.  The claimant's current medication regimen consists of Remeron 15 mg. daily, Doxepin 50 mg. three times daily, and Klonopin 5 mg. daily, which the claimant testified were effective in reducing, but not completely eliminating his symptoms.  The only side effects the claimant reported from his current medication were increased appetite, dry mouth, and minor memory loss.  In general, the claimant's mental health improved until his  father passed away in November 2008.  He reported to Dr. Rana that he cried daily after his father's death, and his anxiety and panic attacks increased.  After several more medication adjustments, the claimant reported in March 2009 that his anxiety attacks were down to two to four times per week, and the following month, only a few times a week, and he felt he was slowly improving.  The claimant continued to report improvement, stating in May 2009 he could go out of the house.  However, by August 2009, he expressed increasing anxiety because school would be starting the next month.  At the beginning of September 2009, the claimant reported less anxiety and no panic attacks, but a changed sleep cycle (Ex. 15F).

There is a significant gap in the treatment notes of Dr. Jana from September 2009 until the claimant returned in May 2010 in a panic state, reporting that he had a horrible panic attack the other day and went to the emergency department.  The psychiatrist substituted Klonopin 0.5 mg. three times daily for Celexa 20 mg., and added Prozac 20 mg., Trazodone 100 mg. daily, and Xanax 0.5 mg. three times daily.  Over the following months, the claimant returned to Dr. Jana every one to two months with complaints of side effects to various medications, and increasing and decreasing symptoms of depression and anxiety.  By the beginning of December 2010, Dr. Jana lectured the claimant about changing his medications at will, and advised him to contact the office before making any changes and not to stop taking medications altogether, which he had done.  Because the claimant indicated that his anxiety was under control, but increasing depression was the current problem, Dr. Jana discussed the possibility of bipolar disorder, and prescribed a mood stabilizer, Trileptal 150 mg. twice daily in addition to Effexor 1/8 of 1 mg. at bedtime.  The claimant reported two weeks later that the medication had improved his mood and

8

helped with anxiety, but felt that the effects of the medication wore off too soon, and Dr. Jana increased the frequency of Trileptal to three times daily and substituted Valium 10 mg. for anxiety (Ex. 15F).

Subsequently, Dr. Jana adjusted the medication regimen almost monthly after the claimant indicated he no longer wanted to take Valium because it stayed in the body for a long time, and complained of symptoms of confusion and loss of concentration due to Trileptal.  In March 2011, Dr. Jana prescribed Remeron 15 mg. daily, Trazodone 100 mg. daily, and Dexedrine 15 mg. twice daily. More adjustments to medication followed, and Dr. Jana remarked that the claimant was fixated on his complaints, and focused on side effects of his medications.  He also noted that the claimant's sleep was disturbed and sometimes he slept all day, and other times slept only a few hours at night, and napped during the day.  The psychiatrist noted that the claimant engaged in little outdoor activity.  Dr. Jana discussed with the claimant the importance of a fixed sleep schedule, and encouraged him to incorporate physical activity in his daily regimen.  Dr. Jana also warned the claimant not to change his medication without consulting his office.  However, the psychiatrist noted that the claimant continued to struggle with an irregular schedule, not sleeping or waking at appropriate times, and verbalizing about excessive tiredness during the day.  Dr. Jana also indicated that the claimant self-adjusted his medication again in October 2011, restarting the Klonopin 1 mg. twice daily, which he had complained the month before was not helping and was thus discontinued by Dr. Jana. By December 2011, the claimant had increased the frequency of Klonopin to three times daily himself, and reported that he had a more regular sleeping schedule, going to bed around 9:00PM or l0:00PM and waking up about 8:00AM. The claimant reported that he was able to stay organized with this schedule.  Dr. Jana noted that the claimant was still trying to dictate his medications, changes in timing and dose, and still was much consumed with having panic attacks, intolerance to medication, withdrawal symptoms from medication and side effects from medication.  At that point, Dr. Jana prescribed the medication combination that the claimant reported at the hearing was effective in controlling his symptoms:  Klonopin 1 mg. three times daily, Remeron 15 mg. at night, and Doxepin 50 mg, two tablets at night (later increased to three tablets at night when the claimant complained that the effects were wearing off too soon) (Ex. 15F).

9

Treatment notes from the claimant's primary care provider, Christopher Sears, M.D., also describe various complaints of insomnia and medication side effects.  In June 2010, Dr. Sears refused to prescribe more Xanax after the claimant "burned through" those prescribed by his psychiatrist because he was taking more than prescribed, and three months later, the claimant returned with complaint of anxiety, all over pain, and insomnia which he attributed to Xanax withdrawal, even though he was still taking Xanax.  In May 2011, after complaining of insomnia that was not resolved with Ambien, Temazepam, Alprazolam, Lorazepam, or Benadryl, the claimant was referred for clinical polysomnography that showed no sign of obstructive sleep apnea or periodic leg movements.  The claimant was encouraged to lose weight to relieve pathological snoring.  Dr. Sears has prescribed Provigil 100 mg. in the morning for excessive daytime sleepiness, and encouraged the claimant to lose weight and engage in regular exercise lasting 20 to 30 minutes per day at least five times weekly.  In July 2011, the claimant complained of dizziness, excessive thirst and painful limbs after self-decreasing his Valium dosage (Ex. 14F).

(Tr. 19-24).

**Opinion Evidence**

In April 2010, Dr. Litwin conducted a psychological evaluation for the BVR, found Plaintiff was not ready to "move forth vocationally," and instead should focus on obtaining his GED and volunteering in the community due to his depressed state.  (Tr. 273-76).  On examination, Plaintiff did not report any physical limitations and said he would like to attend college and study science or do research.  (Tr. 273).  He had a high average full range IQ, very superior verbal IQ, and average performance IQ.  (Tr. 274).  He also scored above a twelfth grade level on all six aptitude tests.  (Tr. 274).  Dr. Litwin encouraged exercise, sleep regulation, and eating well.  (Tr. 276).  Dr. Litwin diagnosed ADHD, major depressive disorder, and assigned a global assessment of functioning (GAF) score of 50.  (Tr. 275).

On August 17, 2010, Plaintiff drove himself to a consultive examination with Dan McIntire, Ph.D.  (Tr. 277-83).  Plaintiff said he thought his anxiety and depression developed because he had been bullied while he was in school.  (Tr. 278).  Plaintiff was able to read books, newspapers, and magazines and "comprehend the material quite well, particularly when he [was] taking his Dexedrine."  (Tr. 278).  He was good at writing and spelling and was able to add, subtract, multiply, and divide.  (Tr. 278).  He reported difficulty keeping track of appointments but was able to drive without losing track of where he was going.  (Tr. 278).  "He stated that, when he is on his medication, he is able to follow multi-step instructions but when he is off his medication, he would need

10

reminders." (Tr. 278).  Plaintiff also admitted he was forgetful when he was not on medication; however, when he is on medication, "he improves in all of these areas and does not have significant difficulties." (Tr. 280).  Dr. McIntire noted Plaintiff's testing with Dr. Litwin indicated "[h]e was found to have academic abilities that were above a 12th grade level." (Tr. 278).  He also noted Plaintiff's verbal skills were in the "very superior range." (Tr. 281).

Concerning daily activity, Plaintiff said he spent most of his day "surfing the web, reading, listening to lectures on the computer, or reading academic materials." (Tr. 281).  He occasionally watched television, was able to take care of his own laundry, cooked very basic meals, would be able to shop independently if he had a list, and could manage his own finances. (Tr. 281).

Plaintiff said he got along well with his family and was a member of a conservation organization but had only attended one meeting. (Tr. 278).  He did not socialize with friends because they had "moved on to other areas." (Tr. 278). He got along well with his neighbors and "denie[d] any significant difficulties with anxiety when he is around other people and stated he is able to go to the local store" to make purchases without any difficulty. (Tr. 278).  He was able to eat alone in the middle of a restaurant, use public transportation, and walk around his neighborhood without difficulties. (Tr. 278).  Plaintiff admitted medications have helped with his anxiety and he had never made any suicide attempts but had suicidal thoughts on two occasions. (Tr. 279).  Plaintiff reported working as a telemarketer for a few months but left because he found the work "extremely monotonous" and admitted he becomes bored very easily. (Tr. 279).

On examination, Plaintiff presented with a "normal range of emotions[,]" and was articulate, provided complete answers, was able to initiate conversation, exhibited a full range of inflections, and was oriented to person, place, and time. (Tr. 279-80).  He had been feeling depressed since his father's death two years prior and had become apathetic and withdrawn, sleeping twelve to fourteen hours per day. (Tr. 280).  He was able to recall numbers, spell "[w]orld" in reverse, add three sets of numbers, and name four presidents since 1950. (Tr. 280).

Dr. McIntire found Plaintiff had no difficulties with long-term memory as he gave adequate dates and details. (Tr. 280).  He also found Plaintiff was in the high average range of intellectual functioning; was able to engage in abstract reasoning; had no difficulty expressing himself; and had a good fund of knowledge and fair judgment. (Tr. 280-81).  He diagnosed Plaintiff with dysthymia, generalized anxiety disorder, panic disorder, ADHD, and assigned a GAF score of 54 based on depression, negative cognitive focus, crying spells, occasional apathy, and self-deprecating thoughts. (Tr. 282).

In concluding, Dr. McIntire found Plaintiff did "not have any significant medical problems at this time." (Tr. 281).  He found Plaintiff's ability to work around others mildly impaired; his ability to understand, remember, and follow brief, simple instructions unimpaired; his ability to understand, remember, and follow lengthier or more complicated instructions mildly impaired; his ability to read instructions and understand abstract instructions unimpaired; his ability to

11

maintain attention and concentration to complete tasks moderately impaired when he is not on medication; his ability to concentrate to complete simple repetitive tasks or single-step tasks mildly impaired; his ability to concentrate to complete more complicated tasks that require mental manipulation of information moderately impaired; and his ability to manage emotional stress of everyday work life markedly impaired. (Tr. 282-83).

On August 26, 2010, state agency psychologist Mel Zwissler, Ph.D., reviewed the evidence, prepared a psychiatric review technique form, and provided a mental RFC assessment. (Tr. 285-302). Dr. Zwissler found Plaintiff was not significantly limited in the areas of understanding and memory. (Tr. 299). He also found Plaintiff not significantly limited in the areas of sustained concentration and persistence, social interaction, or adaptation except that he was moderately limited in his ability to interact with the general public, respond appropriately to changes in the work setting, set realistic goals, complete a normal workday or workweek without interruption from symptoms, and maintain concentration or attention for extended periods. (Tr. 299-300). On January 25, 2011, state agency psychologist Patricia Semmelman, Ph.D., affirmed Dr. Zwissler's assessment as written. (Tr. 316).

On October 21, 2010, Dr. Sears filled out a medical source statement at the request of the state disability bureau. (Tr. 315). Dr. Sears indicated he had referred Plaintiff to a mental health specialist but wrote "n/a [not applicable]" when asked if Plaintiff had any physical health problems or had any functional restrictions related to his mental impairments. (Tr. 315).

On February 7, 2012, Dr. Rana completed a Mental Questionnaire to assess Plaintiff's mental functioning. (Tr. 509-10). He noted Plaintiff had a history of depression and anxiety since he was twelve years old and he continued to be depressed without improvement. (Tr. 509-10). He found Plaintiff could not sustain concentrated tasks, would be distracted by others, would be overwhelmed with complex tasks, and would become panicky and depressed. (Tr. 509). He diagnosed major depression, recurrent, severe; social phobia; ADHD; obesity; and assigned a GAF score of 50.

On a separate form, Dr. Rana completed a residual functional capacity (RFC) assessment where he concluded Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or be aware of normal hazards and take appropriate precautions. (Tr. 521-14). He was moderately limited in his ability to understand and carry out very short and simple instructions and make simple work-related decisions. (Tr. 513-14). He was markedly limited in his ability to understand, remember, and carry out detailed instructions; maintain concentration and attention for an extended period of time; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine; work in coordination with others; complete a normal workday and workweek without interruptions from symptoms; interact appropriately with the general public; ask simple questions or request assistance; accept criticism or respond to

12

supervisors; get along with others; respond appropriately to work place changes; travel to unfamiliar places; or set realistic goals.  (Tr. 512-514).

A therapist in Dr. Jana's office, Patricia Abrahamson, MSSA, LISW, LCSW, also provided an opinion letter.  (Tr. 516-17).  Ms. Abrahamson opined Plaintiff would not be able to "hold down a job or to work in a setting or manner wherein he would not be anxious and continually distracted by others around him." (Tr. 517).

**ALJ Decision**

On March 16, 2012, the ALJ found Plaintiff had the severe impairments of depression, ADHD, anxiety, and panic disorder and the non-severe impairment of obesity.  (Tr. 16).  The ALJ further found these impairments, alone or in combination, did not meet or equal a listed impairment.  (Tr. 16).  He determined Plaintiff had the RFC to perform a full range of work at all exertional levels but non-exertionally, he was only able to perform simple, routine, repetitive tasks in a work environment without exposure to hazardous conditions.  (Tr. 19).  Based on VE testimony, the ALJ concluded Plaintiff was able to perform work as an assembler/bench worker, both at the medium and light exertional levels, inspection worker, and cashier/toll taker; thus, he was not disabled.  (Tr. 30).

### III.  Nitecki's Arguments

Mr. Nitecki asserts that the Magistrate Judge ignored his background, specifically that he was bullied while he was in school.  Mr. Nitecki complains that the Magistrate Judge refused "to see the causative connection of obesity to increased depression."  (Doc. No. 19, p. 1).  The ALJ discussed the bullying and resulting implications in his decision, which the Magistrate Judge incorporated into his report.  (Doc. No. 18, pp. 3–4).  Thus, the Magistrate Judge did not ignore Mr. Nitecki's past experiences in being bullied at school.

Mr. Nitecki objects to the analysis which the ALJ and Magistrate Judge used in evaluating the opinion of consultative physician Dr. Don McIntire.  Dr. McIntire found Mr. Nitecki had a mild impairment in his ability to work around others, and to understand, remember, and follow instructions.  (Doc. No. 12, p. 286).   Mr. Nitecki was found to be moderately impaired in his ability to maintain attention and concentration when he is not taking his medications, or when he is required to engage in complicated tasks.  (Doc. No. 12, p. 286).  Finally, Dr. McIntire noted that

13

Mr. Nitecki had a markedly impaired ability to manage the emotional stress of daily work due to depression and anxiety.  (Doc. No. 12, p. 287).

The ALJ stated he gave Dr. McIntire's opinion "[f]or the most part, . . . great weight" because it was consistent with his own clinical observations, the medical evidence, and the record as a whole.  (Doc. No. 12, p. 31).  However, the ALJ disagreed with the opinion that Mr. Nitecki had marked difficulty in handling the emotional stress of daily work.  The ALJ based his conclusion on Dr. McIntire's own report which noted that Mr. Nitecki admittedly became bored very easily and quit his job as a telemarketer, not because of stress, but because he found the position "extremely monotonous."  (Doc. No. 12, p. 31).

The Commissioner of Social Security is required to provide a statement discussing the evidence and reasons upon which an application for benefits is denied.  *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467 (6th Cir. 2004).  As a consultative physician, Dr. McIntire's opinion is entitled to less weight than that of a treating physician.  *Id*. at 468.  In discussing Dr. McIntire's report, the ALJ explained why he did not accept the doctor's opinion that Mr. Nitecki had a marked difficulty in handling the emotional stress of daily work.  The ALJ explained that he refused to accept the doctor's opinion regarding Mr. Nitecki's ability to work because the opinion was contradicted by Mr. Nitecki's admissions that he quit work, not because of a mental condition, but because of boredom.  The Court finds the ALJ's explanation is sufficient and the Commissioner's decision on this issue is supported by substantial evidence.  *See Brainard*, 889 F.2d at 681.

Mr. Nitecki next contends that Dr. Richard Litwin was "erroneously projected as a one-time reviewer with his only object to see [sic] if plaintiff can work."  Dr. Litwin evaluated Mr.

Nitecki on April 6, 2010.  (Doc. No. 12, p. 277).  Mr. Nitecki underwent testing through the

Bureau of Vocational Rehabilitation.  (Doc. No. 12, p. 277).  Mr. Nitecki's test results showed a

Verbal IQ of 132, a Performance IQ of 100, and a Full Scale IQ of 117.  (Doc. No. 12, p. 278).

Further testing showed scores indicating a probable attention deficit hyperactivity disorder

(ADHD).  (Doc. No. 12, p. 278).  Personality Assessment Inventory revealed a severely

depressed, discouraged, and withdrawn individual.  (Doc. No. 12, p. 279).  Based on the test

results, Dr. Litwin diagnosed Mr. Nitecki with ADHD, inattentive type, and major depressive

disorder, which was recurrent and severe.  (Doc. No. 12, p. 279).  Dr. Litwin recommended that

instead of vocational placement, Mr. Nitecki complete his GED, explore opportunities to

volunteer in the community, and participate in social or recreational activities to reduce isolation.

Dr. Litwin encouraged Mr. Nitecki to exercise, sleep regularly, and eat a proper diet.  (Doc. No.

12, p. 280).

    In evaluating Dr. Litwin's opinion, the ALJ gave the opinion "little weight because, in

indicating the claimant was unable to perform a job, [Dr. Litwin] addressed an issue reserved for

the Commissioner."  (Doc. No. 12, p. 31).  Further, the ALJ stated that Dr. Litwin's opinion was

based on a single observation whose purpose was to strictly assess Mr. Nitecki's eligibility for

vocational assistance.  (Doc. No. 12, p. 31).

    The determination of disability is ultimately the prerogative of the Commissioner and not a

physician.  *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 274 (6th Cir. 2010); *Warner v.*

*Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  Such an opinion from a physician "is

never entitled to controlling weight or special significance."  *Ferguson*, 628 F.3d at 274 (internal

quotation marks and citation omitted).  Because Dr. Litwin's opinion went beyond the scope of his

15

assignment, i.e., to determine Mr. Nitecki's eligibility for vocational assistance, into the prerogative of the Commissioner, the ALJ's analysis of the opinion was not erroneous and is supported by substantial evidence.

Mr. Nitecki next challenges the ALJ's assessment of Dr. Jatinder Rana's reports.  The ALJ recognized Dr. Rana as a treating physician, having provided psychiatric treatment and medications to Mr. Nitecki since April 2008.  Upon his first assessment of Mr. Nitecki, Dr. Rana diagnosed a depressive disorder.  Dr. Rana prescribed Mr. Nitecki medication.  After a month, Mr. Nitecki reported his sleep and mood were improving, but expressed anxiety relating to school and testing issues.  In subsequent months, Dr. Rana substituted various medications in an attempt to control Mr. Nitecki's symptoms.  The ALJ noted that Mr. Nitecki's current medications have effectively reduced, but not completely eliminated, his symptoms.  The only reported side effect of his current drug regime is an increased appetite, dry mouth, and minor memory loss.  (Doc. No. 12, p. 26).

Following the death of his father in November 2008, Mr. Nitecki reportedly cried daily and suffered increased anxiety and panic attacks.  Following readjustments in his medication, Mr. Nitecki stated that his condition was improving.  By September 2009, Mr. Nitecki reported less anxiety and no panic attacks.  However, his sleep cycle had changed.  (Doc. No. 12, p. 26).

Dr. Rana continued to adjust Mr. Nitecki's medications over time as the situation warranted.  By December 2010, Dr. Rana lectured Mr. Nitecki regarding changing his medications at will and not to stop taking his medications altogether as he had done in the past.  (Doc. No. 12, pp. 26–27).  Dr. Rana continued to adjust Mr. Nitecki's medications, eventually noting that Mr. Nitecki had become fixated on this complaints and focused on the side effects of his medications.

16

Dr. Rana reported in October 2011 that Mr. Nitecki had again self-adjusted his medication.  Dr. Rana stated that Mr. Nitecki, contrary to doctor's orders, continued to dictate his medications, changing timing and dosage.  (Doc. No. 12, p. 27).

On February 7, 2012, Dr. Rana completed a Mental Questionnaire to assess Mr. Nitecki's mental functioning.  (Tr. 509–10).  He noted Mr. Nitecki had a history of depression and anxiety since he was twelve years old and he continued to be depressed without improvement.  (Tr. 509–10).  Dr. Rana found Mr. Nitecki could not sustain concentrated tasks, would be distracted by others, would be overwhelmed with complex tasks, and would become panicky and depressed. (Tr. 509).  Dr. Rana diagnosed Mr. Nitecki with major depression, recurrent and severe; social phobia; ADHD; and obesity.

On a separate form, Dr. Rana completed a residual functional capacity assessment where he concluded that Mr. Nitecki was not significantly limited in his ability to remember locations and work-like procedures, or be aware of normal hazards and take appropriate precautions.  (Tr. 512–14).  He was moderately limited in his ability to understand and carry out very short and simple instructions, and make simple work-related decisions.  (Tr. 513–14).  He was markedly limited in his ability to understand, remember, and carry out detailed instructions; maintain concentration and attention for an extended period of time; perform activities within a schedule and maintain regular attendance; sustain an ordinary routine; work in coordination with others; complete a normal workday and workweek without interruptions from symptoms; interact appropriately with the general public; ask simple questions or request assistance; accept criticism or respond to supervisors; get along with others; respond appropriately to work place changes; travel to unfamiliar places; or set realistic goals.  (Tr. 512–14).

17

The ALJ stated that Dr. Rana's opinion regarding Mr. Nitecki's restrictions was "given little weight."  The ALJ found that Dr. Rana relied quite heavily on the subjective report of symptoms and limitations provided by Mr. Nitecki, and seemed to accept as true, most, if not all, of what Mr. Nitecki reported.  The ALJ stated that as explained in his opinion, there was good reasons for questioning the reliability of Mr. Nitecki's subjective complaints.  (Doc. No. 12, p. 32).  Because Dr. Rana is a treating physician, *Cole v. Astrue*, 661 F.3d 931 (6th Cir. 2011), is the controlling decision on the issue of how a treating physician's opinion should be evaluated.  In *Cole*, the court noted that the Commissioner has elected to impose certain standards on the treatment of "medical source evidence."  *Cole*, 661 F.3d at 937.  Under what is commonly known as the "treating physician rule," the Commissioner requires an ALJ to give a treating physician's opinion controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  *Id*. (internal quotation marks and citation omitted).   If the ALJ declines to give a treating physician's opinion controlling weight, the ALJ must then balance the following factors to determine what weight to give the opinion:  1) the length of the treatment relationship and the frequency of the examination; 2) the nature and extent of the treatment relationship; 3) the supportability of the opinion; 4) the consistency of the opinion with the record as a whole; and 5) the specialization of the treating source.  *Id*.

*Cole* noted that the Commissioner requires decision makers to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion."  *Id*. (internal quotation marks and citation omitted).  The reasons must be supported by the evidence

and must be sufficiently specific to inform any subsequent reviewer of the weight given to the treating source's medical opinion, along with the reasons for that weight.  *Id.* (citation omitted).

In his opinion, the ALJ stated he gave Dr. Rana's restrictions on Mr. Nitecki's ability to work "little weight" because the doctor "seemed to accept uncritically as true, most, if not all, of what" Mr. Nitecki had reported.  The ALJ explained that although the medical evidence could reasonably be expected to cause the alleged symptoms, Mr. Nitecki's subject complaints regarding the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the ALJ's residual functional capacity assessment.  (Doc. No. 12, p. 28).  The ALJ then proceeded to present examples of how Mr. Nitecki's subjective allegations were not supported by the record.  Because the ALJ explained how he weighed Dr. Rana's various findings and the reasons for his analysis, *id.*, the ALJ's decision on this issue is supported by substantial evidence.

Mr. Nitecki argues that the ALJ and Magistrate Judge erred in picking portions of the opinions of Drs. McIntire, Litwin, and Rana to create a "hybrid" of what the ALJ "thinks [Mr. Nitecki's] limitations should be."  Mr. Nitecki contends that the ALJ's analysis is contrary to *Hensley v. Astrue*, 573 F.3d 263 (6th Cir. 2009).  *Hensley* is not applicable to this case.  The error committed in *Hensley* occurred when the ALJ adopted the assessment of a treating physician regarding Hensley's residual functional capacity.  *Hensley*, 573 F.3d at 266.  Despite the ALJ's statement of incorporation, the ALJ's actions were inconsistent with the statement of incorporation.  The court stated that two treating physicians made unequivocal, conflicting statements regarding Hensley's ability to engage in repetitive pushing and pulling.  The ALJ did not accept either opinion, and made his own evaluation, concluding that Hensley could do

19

repetitive pushing and pulling, but only occasionally, a standard which neither physician had adopted.  The court noted that the ALJ failed to explain the reasoning for this conclusion.  *Id.*

The ALJ in this case, unlike the ALJ in *Hensley*, explained why he gave the various opinions of Drs. McIntire, Litwin, and Rana the weight he did.  The ALJ discussed the opinions of each physician and his evaluation of those opinions.  Thus, the error committed in *Hensley* was not committed in this case.

Mr. Nitecki objects to the assessment of the side effects of his medications by the ALJ and Magistrate Judge.  The ALJ recognized and discussed the side effects of Mr. Nitecki's medications on his ability to work.  (Doc. No. 12, p. 30).  The ALJ stated that Mr. Nitecki's current side effects of increased appetite and dry mouth were mild and did not interfere with his ability to perform work "in any significant manner."  (Doc. No. 12, p. 30).  Regarding the alleged memory loss from his use of the drug Klonopin, the ALJ found this side effect to be generally mild.  The ALJ stated he accommodated for this side effect in his restriction of Mr. Nitecki to performing simple, repetitive, and routine tasks that would not require extensive memorization or detailed instructions.  (Doc. No. 12, pp. 30–31).  Further, the ALJ stated that Mr. Nitecki's other side effects, such as dizziness, are accommodated by the restriction to work without exposure to hazardous conditions.  (Doc. No. 12, p. 31).  The ALJ's explanation is sufficient to establish that he considered the side effects of Mr. Nitecki's medications in reaching his residual functional capacity assessment and accommodated for the side effects in his assessment.  *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).

Mr. Nitecki also asserts that his side effects were not incorporated into the ALJ's hypothetical question to the vocational expert.  As previously noted, the ALJ stated that he

considered the side effects of Mr. Nitecki's medications by restricting him to simple, repetitive, and routine tasks that would not require extensive memorization or detailed instructions, and by restricting the work from exposure to hazardous conditions.  (Doc. No. 12, pp. 30–31).  The ALJ specifically included these restrictions in his hypothetical question to the vocational expert.  (Doc. No. 12, p. 73).  Therefore, contrary to Mr. Nitecki's assertion, the side effects were incorporated in the hypothetical question through the residual functional restrictions the ALJ placed on Mr. Nitecki.

Mr. Nitecki argues that the vocational expert's answers to his attorney's hypothetical questions prove he is disabled.  Counsel's hypothetical questions rely on Dr. Rana's restrictions.  However, the ALJ rejected Dr. Rana's restrictions.  The ALJ "is not required to simply accept the testimony of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence." *Griffith v. Comm'r of Soc. Sec.*, No. 13-6570, 2014 WL 3882671, at *8 (6th Cir. Aug. 7, 2014). The ALJ may ask a vocational expert hypothetical questions which are supported by the evidence in the record.  *Hardaway v. Sec'y of Health & Human Servs.*, 823 F.2d 922, 927 (6th Cir. 1987). Because Dr. Rana's restrictions had been rejected by the ALJ as not supported by the evidence, the ALJ could reject the vocational expert's testimony which was based on these restrictions.  *Id.*

### IV.  Conclusion

Accordingly, the Magistrate Judge's report and recommendation is adopted and the Commissioner's denial of Mr. Nitecki's applications for supplemental security income benefits and for child's insurance benefits is affirmed.

IT IS SO ORDERED.

    s/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE